IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JAMES MAHON, IV,** | No. 3:09cv2148 |
| Plaintiff | |
| v. | (Judge Munley) |
| **LAKE LEHMAN SCHOOL DISTRICT; CHARLES BALAVAGE; MARK KORNOSKI; HAROLD GREY; HAROLD CORNELL; JOHN OLIVER, III; and MODERNO ROSSI,** | |
| Defendants | |

## **MEMORANDUM**

Before the court is the defendants' motion for summary judgment. (Doc. 27). Having been briefed, the motion is ripe for disposition.

## **BACKGROUND**

This is a civil rights action originally brought by Plaintiff James Mahon, IV ("Mahon, IV") and his father James Mahon, III ("Mahon, III"). Mahon, IV is a former member and president of the Lake Lehman School Board. (Defs.' Statement of Material Facts ("SMF") ¶ 1 (Doc. 29)). Mahon, IV had been on the board from December of 2001 to December of 2005. (Mahon, IV Dep. (Doc. 33-2 at 20)). Mahon, IV served as president from December 2003 through November 2005. (Mahon, IV Decl. ¶ 2 (Doc. 33-5)). Mahon, III is a former assistant girls' basketball coach for Lake Lehman High School. (SMF ¶ 2). Mahon, III had been an assistant coach for four or five years, earning approximately $4,000.00 per season. (Doc. 33-2 at 15; Moderno Rossi Dep. (Doc. 33-10 at 9)).

Defendants Charles Balavage ("Balavage"), Mark Kornoski ("Kornoski"), Harold Grey ("Grey") and John Oliver, III ("Oliver") were members of the Lake Lehman School Board. (Compl. ¶¶ 10-14). They will be referred to collectively as the Board Member Defendants.

As a board member and president, Mahon, IV had been very involved in brokering a contract between Defendant Lake Lehman School District ("the District") and the teachers' union in 2002. (Mahon, IV Dep. (Doc. 33-3 at 3). That agreement expired on August 31, 2006. (Doc. 33-2 at 24-25). In early 2007, Superintendent James McGovern ("McGovern" or "the superintendent") and the teachers' union representatives, Phillip Lipski and Danny Williams, approached Mahon, IV and asked him to speak with the current school board members about the teachers' demands. (Doc. 33-2 at 24, 29). At this point, Mahon, IV was a private citizen and not a member of the board. (Doc. 33-2 at 26).

McGovern had called Mahon, IV and indicated that the parties ought to reach a deal, but that he needed help getting a fifth vote from the nine-member school board. (Doc. 33-2 at 27). Mahon, IV, in turn, called board members Bob Perrone ("Perrone"), Lois Kopcha ("Kopcha"), Harold Cornell ("Cornell"), Jim Welby ("Welby"), and Drew Salko ("Salko"). (Doc. 33-2 at 29). Everyone with whom Mahon, IV spoke supported the agreement but none wanted to be the deciding fifth vote publicly. (Doc. 33-2 at 30). Mahon, IV did not speak to Balavage, Kornoski, Grey, or Oliver. (Doc. 33-2 at 30-31). Mahon, IV considered Balavage and Kornoski as staunch opponents of the teachers' union. (Doc. 33-2 at 25).

Apparently, in 2006, though Mahon, IV was not a board member, he had agreed with Kornoski and Balavage to convince Kopcha to be the fifth vote for football coach Carl Kern and, in return, Mahon, III would be hired as the assistant basketball coach in 2006. (Doc. 33-2 at 32-33).

Sometime around May of 2007, Mahon, IV heard from Kornoski and Rossi that the board was not happy about Mahon, IV's involvement in the negotiations of the teachers' contract. (Doc. 33-3 at 10). Mahon, IV indicates that Rossi communicated an initial message to stay out of school

2

board business, on behalf of Kornoski, Balavage, Oliver, Grey, and later from Cornell also.  (Doc. 33-2 at 31-32).  Rossi expressly told Mahon, IV that he was delivering a message from board members Cornell, Oliver, Balavage, Kornoski, and Grey.  (Doc. 33-2 at 33-34).

Upon hearing this, Mahon, IV called Cornell in May 2007 to make sure that Cornell was not waivering in his support of Mahon, III's assistant coach position.  (Doc. 33-3 at 10).  Cornell indicated to Mahon, IV over the phone that he would vote for Mahon, III if Mahon, IV kept out of school business.  (Doc. 33-3 at 9-10).  Cornell denies coming to such an agreement.  (Cornell Dep. (Doc. 33-11 at 15)).  Cornell was to be the deciding fifth vote in favor of the union contract.  (Doc. 33-3 at 8).

According to Mahon, IV, Kornoski– like Cornell– told him that if he did not back off on the teachers' union issues then Mahon, III would not be re-hired as assistant basketball coach.  (Mahon, IV Dep. (Doc. 33-3 at 6)). Korsnoski's call was also around May of 2007.  (Doc. 33-3 at 7).

Rossi denies conveying such a message on behalf of the board. (Rossi Dep. (Doc. 33-10 at 6)).  Rossi recalls Mahon, IV telling him that he was afraid Mahon, III would not be hired back to coach.  Rossi asked Kornoski, with whom he worked, why Mahon, III was not going to be re-hired.  Kornoski told Rossi that there weren't enough girls on the team and Rossi "told [Kornoski] to let [Mahon, III] alone."  (Rossi Dep. (Doc. 33-10 at 4-5)).

In June of 2007 the school board and superintendent walked away from a tentative agreement with the union, prompting Mahon, IV to speak with Mark Guydish of the Times Leader newspaper.  (Doc. 33-3 at 17). Mahon, IV indicated that a majority of board members favored the agreement, but no board member wanted to be the deciding fifth vote. (Doc. 33-3)  Mahon, IV also told Guydish that the contract made financial

3

sense for the District and that the school superintendent was bowing to pressure from the board.  (Doc. 33-3).

Sometime before November 2007, Mahon, IV also appeared on the Sue Henry radio show on WILK in Wilkes-Barre, Pennsylvania.  (Doc. 33-3 at 17-18).  Mahon, IV discussed why the contract was a good idea for the District, explaining that the union's demand to pay healthcare co-pays at the point of service made more financial sense than taking the amount from the teachers' paychecks.  (Doc. 33-3 at 30-32).  Mahon, IV criticized the school board for exposing the students to uncertainty and accused the board of not having the "guts" to do the right thing.  (Doc. 33-3 at 30-31).  Mahon, IV indicated that Kornoski and Balavage were blocking the agreement.  (Id.)

Oliver denies hearing Mahon, IV on the radio.  (Oliver Dep. (Doc. 33-12 at 6)).  Oliver also denies seeing any online comments by Mahon, IV.  (Oliver Dep. (Doc. 33-12 at 8)).  Cornell denies knowing that Mahon, IV spoke on the radio or made comments online.  (Cornell Dep. (Doc. 33-11 at 16-17)).  Grey denies knowing of any comments by Mahon, IV on the radio.  (Grey Dep. (Doc. 33-6 at 11)).  Rossi denies knowing of any radio, television, or newspaper comments by Mahon, IV.  (Rossi Dep. (Doc. 33-10 at 4)).  Superintendent McGovern heard about Mahon, IV's public comments second-hand.  (McGovern Dep. (Doc. 33-7 at 3)).  Salko had also heard about the radio comments second-hand.  (Salko Dep. (Doc. 33-8 at 5)).

According to Mahon, IV, immediately after Mahon, IV's appearance on the radio program, Oliver, Kornoski, Balavage, and Cornell tried to have his daughters' all-american athletic photo removed from the wall at the high school, but the superintendent stopped him.  (Doc. 33-4 at 8; McGovern Dep. (Doc. 33-7 at 8-9)).  Mahon, IV heard about this from Welby, Salko,

Kocha, and Superintendent McGovern. (Doc. 33-4 at 8). According to McGovern, Balavage and Kornoski wanted a policy where only photos depicting athletes in Lake Lehman uniforms could be displayed, but McGovern objected because certain athletes did not have any photos in their high school uniforms. ((McGovern Dep. (Doc. 33-7 at 9)). Thus, some athletes– those who only had collegiate photographs– would no longer be represented.

 According to Mahon, IV, at one point Cornell made Athletic Director Tom Rokita remove Mahon, IV from the bench area at a field hockey game. (Doc. 33-4 at 12-14). Cornell specifically denies this assertion. (Cornell Dep. (Doc. 33-11 at 9, 21)).

 On October 12, 2007 Mahon, IV saw a cardiologist for an emergency evaluation due to stress. (Doc. 33-3 at 28; Doc. 33-4 at 1-2). Mahon, IV was having chest pain and his wife, a cardiac nurse, thought he might be having a heart attack. (Doc. 33-4 at 1-3). Mahon, IV attributes his medical complications to the stress of the union negotiations and the threat against his father's job. (Doc. 33-4 at 4-5). Mahon, IV did not tell Mahon, III about the board's threat to the assistant basketball coach position. (Doc. 33-3 at 28).

 Mahon, III's assistant basketball coach position was on the school board's agenda for its meeting on or about November 7, 2007. The practice in the School District had been that varsity coaches chose their assistants, and that these choices were approved unless there was a problem with the choice. (Doc. 33-2 at 17). Head Women's Basketball Coach James Spencer had chosen Mahon, III as his assistant. (Doc. 33-2 at 17; Doc. 33-3 at 21-22).

 McGovern confirms that head coaches recommend a specific assistant coach to the athletic director, human resources department, and

5

superintendent for administrative approval. (McGovern Dep. (Doc. 33-7 at 4)). The prospective assistant coach is then placed on the school board agenda for a vote. McGovern generally assumes that anyone recommended by a head coach and approved by the athletic director, human resources department, and superintendent and placed on the agenda will be approved. (McGovern Dep. (Doc. 33-7 at 4-5)).

The school board met in executive session the week before the November 7, 2007 vote on the assistant basketball coach position. (Doc. 33-3 at 27). Mahon, IV was told by Welby and Salko that, during executive session, Oliver had said "if Mahon[, IV] won't shut his mouth, let's teach him a lesson and we won't hire his father." (Doc. 33-3 at 26, 27). According to Mahon, IV, Welby indicated that Balavage, Kornoski, Grey, Cornell, and Oliver all agreed on this course of action. (Doc. 33-3 at 26).

Salko remembers other board members being upset that Mahon, IV was commenting on the contract negotiations and that, during the executive session, comments were made that Mahon, III should not be hired, in return. (Salko Dep. (Doc. 33-8 at 4)). According to Salko, during executive session, a board member had said that Mahon, IV had been "running his mouth, commenting . . . and making contract negotiations more difficult" and that "Oliver said . . . this is our chance to either shut him up or get him back or send him a message, something to that effect." (Salko Dep. (Doc. 33-8 at 6)). Salko specifically recalls Oliver suggesting retribution. (Salko Dep. (Doc. 33-8 at 5)).

Welby does not remember the exact language used, but heard Oliver say "something to the effect of 'we'll get rid of the old man and that will really aggravate the heck out of [Mahon, IV].'" (Welby Dep. (Doc. 33-9 at 4, 6)). Welby indicates that Kornoski, Grey, Cornell, Balavage, and Oliver wanted to get back at Mahon, IV for supporting the teachers' contract

6

negotiations, among other resentments. (Welby Dep. (Doc. 33-9 at 5-6, 9)).

Oliver specifically denies making that statement during executive session. (Oliver Dep. (Doc. 33-12 at 9)). Cornell also denies that any board member mentioned Mahon, IV's involvement in the contract negotiations or suggested retaliation. (Cornell Dep. (Doc. 33-11 at 12, 14, 20)). Grey recalls Mahon, IV's name coming up occasionally during school board meetings or executive sessions. (Grey Dep. (Doc. 33-6 at 4)). Grey denies any discussion that Mahon, IV should be pressured against speaking. (Grey Dep. (Doc. 33-6 at 13-14)). McGovern was generally aware of animosity on the part of the Defendant Board Members towards Mahon, IV's involvement in the contract negotiations but was not privy to specific comments and never heard any suggestion of retaliation. (McGovern Dep. (Doc. 33-7 at 4)).

On or about November 7, 2007, the School District, through its school board, voted not to approve Mahon, III as assistant basketball coach. (SMF ¶ 3). Oliver recalls discussing Mahon, III during a board meeting and deciding to eliminate the assistant coaching position because there were too few female athletes. (Oliver Dep. (Doc. 33-12 at 5)). Oliver does not know if the assistant coaching position was ever filled. (Id.) Cornell and Grey also voted not to approve Mahon, III on the basis that there were not enough girls on the team. (Cornell Dep. (Doc. 33-11 at 6-7); Grey Dep. (Doc. 33-6 at 5, 12)). Grey could not recall the athletic director informing the school board of the number of girls on the team and could not recall on what basis the board determined that there were not enough girls to warrant another assistant. (Grey Dep. (Doc. 33-6 at 6)).

According to McGovern, the assistant coach position was not eliminated, but instead filled by Danielle Kern. (McGovern Dep. (Doc. 33-7

7

at 5)).  The board did not tell McGovern why Mahon, III was not approved. (McGovern Dep. (Doc. 33-7 at 5)).  According to McGovern, it was unprecedented for the school board not to approve an assistant coach agenda item.  (McGovern Dep. (Doc. 33-7 at 6)).

Mahon, IV and Mahon, III filed a complaint on November 3, 2009, alleging that the defendants did not renew Mahon, III's coaching position in retaliation for Mahon, IV's speech supporting the School District's teachers, in violation of the First Amendment.  (Compl. ¶¶ 16, 17).  The defendants filed a motion to dismiss on January 5, 2010.  (Doc. 9).  On May 5, 2010, the motion was granted with respect to Mahon, III because the plaintiffs had not alleged any speech on his part.  (Doc. 15).  Accordingly, Mahon, III was dismissed from the case, leaving only Mahon, IV's claim.

On January 20, 2011, the defendants moved for summary judgment. (Doc. 27).  The motion has been briefed, bringing the case to its present posture.

**JURISDICTION**

The court has federal question jurisdiction over this civil rights action brought under 42 U.S.C. § 1983.  See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); 28 U.S.C. §§ 1343(a)(3), (4) (granting district courts jurisdiction over civil actions brought to redress deprivations of constitutional or statutory rights by way of damages or equitable relief).

**LEGAL STANDARD**

Before the court is the defendants' motion for summary judgment. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

When considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

**DISCUSSION**

Mahon, IV has brought suit pursuant to section 1983 for First Amendment retaliation. We will address the merits of that claim and then analyze defenses raised by the defendants.

9

**1. Section 1983 Claim**

Section 1983 does not, by its own terms, create substantive rights. Rather, it provides remedies for deprivations of rights established elsewhere in the Constitution or federal law. United States v. Kneipp, 95 F.3d 1199, 1204 (3d Cir. 1996). In pertinent part, section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Thus, to establish a claim under section 1983, two criteria must be met. First, the conduct complained of must have been committed by a person acting under color of state law. Second, the conduct must deprive the plaintiff of rights secured under the Constitution or federal law. Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 590 (3d Cir. 1998). We will address these criteria, in order.

**(a). State Actors**

We must determine whether the defendants were acting under color of state law when they denied Mahon, III's coaching position. The defendants reiterate their argument, first made in their motion to dismiss, that Rossi is not a state actor because he was not on the school board during the events in question.

A state actor is one who "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Abbot v. Latshaw, 164 F.3d 141, 146 (3d Cir. 1998) (quoting West v. Atkins, 487 U.S. 42, 49 (1988); United States v. Classic, 313 U.S. 299, 326 (1941)). Additionally, however, "[p]rivate

persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents." Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970) (internal quotation and citation omitted). In Adickes, the United States Supreme Court determined that a reasonable jury could have found state action on the part of a private store employee where "there was a policeman in the Kress store while petitioner was awaiting service, and that this policeman reached an understanding with some Kress employee that petitioner not be served." Id. at 157.

Thus, it is clear under the law that Rossi can be considered a state actor despite the fact that he was not a board member, so long as he was jointly engaged with the board members. The defendants argue that the record shows no joint activity on the part of Rossi to deprive Mahon IV of his constitutional rights. The defendants argue that the deprivation alleged here was the decision not to hire Mahon III and that Rossi did not participate in that decision. The defendants argue that even if Rossi communicated the alleged threat of retaliation, that threat did not constitute a deprivation in and of itself. The plaintiff argues that, by acting as a messenger, Rossi was directly participating with the board in the retaliation.

We determine that a reasonable jury could find that Rossi had reached an understanding with the Defendant Board Members to retaliate against Mahon, IV for his public speech and to dissuade Mahon, IV from further speech. While Rossi was not a member of the school board and did not vote to deny Mahon, III his coaching position, that is not required in order to find joint activity. It is sufficient that a reasonable jury could find

that Rossi came to an understanding with the board members that Mahon, IV would be threatened and retaliated against for speaking publicly about the contract negotiations. There is a genuine issue of material fact as to whether Rossi did in fact communicate a threat to Mahon, IV and the defendants' motion for summary judgment will be denied.

### (b). Constitutional Rights

Having established that the defendants were state actors for purposes of section 1983, we must determine whether they deprived Mahon, IV of his First Amendment rights. Mahon, IV alleges that the defendants blocked the renewal of Mahon, III's public employment in retaliation for Mahon, IV's speech in support of teachers in the School District.

"The Supreme Court has explicitly held that an individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment rights." Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 283 (1977)). A First Amendment retaliation claim under 42 U.S.C. § 1983 requires that plaintiffs "show (1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citing Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006); Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003)).

The defendants apparently concede the first two elements of Mahon, IV's retaliation claim, and argue only that the plaintiff cannot establish that

the Defendant Board Members knew of Mahon, IV's public speech. If the Defendant Board Members did not know of Mahon, IV's speech, the defendants argue, then there can be no causal relationship between the speech and the decision not to hire Mahon, III. See Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.") (citing Allen v. Iranon, 283 F.3d 1070, 1076 (9th Cir. 2002)). The School District also notes that temporal proximity between protected activity and an allegedly retaliatory action– though it can be used to infer that the activity substantially motivated the retaliation– cannot be a plaintiff's only evidence that the defendant was actually aware of the protected activity. Ambrose, 303 F.3d at 494; see also Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) ("To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.").

    The defendants argue that the record does not show that any Defendant Board Members knew of Mahon, IV's two instances of protected activity– speaking to the newspaper columnist, Guydish, and appearing on the Sue Henry radio show. The School District also argues that there is no "unusually suggestive temporal proximity" or "pattern of antagonism coupled with timing" in this case. Mahon, IV responds that the defendants' statements establish causality. (See Pl.'s Br. Opp. 12 (Doc. 34) ("the causal connection between protected activity, and retaliation is proven by the defendants['] own words to get young Jim by firing his father for young Jimmy's help in the teachers negotiations.")).

    The defendants' motion for summary judgment will be denied with

13

respect to whether Mahon, IV was deprived of his First Amendment rights. A reasonable jury could infer that the Board Member Defendants were aware of Mahon, IV's speech, based on Salko's statement that someone said during executive session that Mahon, IV was speaking out about the contract negotiations.  A reasonable jury could also find that, during executive session, Oliver said that Mahon, III should be denied his position in order to punish Mahon, IV for speaking or dissuade him from doing the same and that the other Defendant Board Members agreed with this course of conduct.  If a reasonable jury found that Oliver made that statement, causality would necessarily be established: the statement itself establishes that the retaliatory act was taken in direct response to the speech, obviating any inquiry into temporal proximity or historical antagonism.  Thus, genuine issues of material fact exist as to whether the board members knew of Mahon, IV's public speech and agreed to retaliate because of that speech.  Accordingly, the defendants' motion for summary judgment will be denied with respect to Mahon, IV's § 1983 claim of First Amendment retaliation.

### 3. Legislative Immunity

The Board Member Defendants claim that they are entitled to absolute legislative immunity from liability for their refusal to renew Mahon, III's coaching position.  "The principle that legislators are absolutely immune from liability for their legislative activities has long been recognized in Anglo-American law.  This privilege 'has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries' and was 'taken as a matter of course by those who severed the Colonies from the Crown and founded our Nation.'"  Bogan v. Scott-Harris, 523 U.S. 44, 48-49 (U.S. 1998) (quoting Tenney v. Brandhove, 341 U.S. 367, 372 (1951)).

Accordingly, the United States Supreme Court, in Tenney v.

Brandhove, "held that the doctrine of legislative immunity, as applied to state legislators, survived the enactment of § 1983." Carver v. Foerster, 102 F.3d 96, 99 (3d Cir. 1996). The doctrine has since been extended to regional and local legislators. See id. (citing Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391 (1971) (extending immunity to regional legislature); Aitchison v. Raffiani, 708 F.2d 96 (3d Cir. 1983) (extending immunity to local legislature)).

"Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" Bogan, 523 U.S. at 54 (quoting Tenney, 341 U.S. at 376). "It matters not that the legislators acted in bad faith. 'The claim of an unworthy purpose does not destroy the privilege.'" Aitchison, 708 F.2d at 98 (quoting Tenney, 341 U.S. at 377). Thus, "[i]n determining whether an official is entitled to legislative immunity, we must focus on the nature of the official's action rather than the official's motives or the title of his or her office." Gallas v. Supreme Court, 211 F.3d 760, 773 (3d Cir. 2000); see also Bogan, 523 U.S. at 54 ("Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it.")).

The United States Supreme Court, in Bogan, implied a two-part test in order to determine whether an action was legislative or administrative. 523 U.S. at 55-56. In Bogan, a city council member was determined to be legislatively immune for voting in favor of an ordinance eliminating the plaintiff's position, among 135 other city positions. See Bogan, 523 U.S. at 55-56. The Court stated its reasoning as follows:

> We need not determine whether the formally legislative character of petitioners' actions is alone sufficient to entitle petitioners to legislative immunity, because here the ordinance, in substance, bore all the hallmarks of traditional legislation. The ordinance reflected a discretionary, policymaking decision implicating the budgetary

15

> priorities of the city and the services the city provides to its constituents. Moreover, it involved the termination of a position, which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office. And the city council, in eliminating DHHS, certainly governed in a field where legislators traditionally have power to act.

Bogan v. Scott-Harris, 523 U.S. 44, 55-56 (U.S. 1998) (internal quotations and citations omitted). The analysis implied by the Supreme Court is identical to the two-part test mandated by the Third Circuit. Under Third Circuit precedent:

> First, the act must be 'substantively' legislative, i.e., legislative in character. Legislative acts are those which involve policy-making decision of a general scope or, to put it another way, legislation involves line-drawing. Where the decision affects a small number or a single individual, the legislative power is not implicated, and the act takes on the nature of administration. In addition, the act must be 'procedurally' legislative, that is, passed by means of established legislative procedures. This principle requires that constitutionally accepted procedures of enacting the legislation must be followed in order to assure that the act is a legitimate, reasoned decision representing the will of the people which the governing body has been chosen to serve.

Ryan v. Burlington County, 889 F.2d 1286, 1290-91 (3d Cir. 1989).

The Board Member Defendants here argue that the decision not to hire Mahon, III was a matter of policy-making, and, therefore, substantively legislative. They also argue that their action was procedurally legislative because they voted on Mahon, III at the board meeting of November 7, 2007. They suggest that this case is "substantially similar" to Bogan.

The court will deny the Board Member Defendants' motion for summary judgment based on legislative immunity. A reasonable jury could find that the assistant basketball coach position was not eliminated. The outright elimination of the position– which the Board Member Defendants claim happened in this case– would have been a matter of policy-making, as explained in Bogan, *supra*. However, a reasonable jury could find that

16

the defendants refused Mahon, III a position and installed another candidate in his place, based on the direct testimony of Superintendent McGovern. This is the sort of decision which the Supreme Court specifically contrasted with a legislative act and which the Third Circuit has found ineligible for immunity. See Bogan, 523 U.S. at 55-56; Aitchison, 708 F.2d at 99 (Third Circuit affirming legislative immunity for mayor voting to abolish assistant building inspector position); Gallas, 211 F.3d at 75 (Third Circuit affirming legislative immunity for decision to eliminate plaintiff's position of Executive Administrator); Montgomery County Comm'rs v. Montgomery County, 215 F.3d 367, 377 (3d Cir. 2000) (affirming denial of legislative immunity because "[f]iring a particular employee is a personnel decision that does not involve general policy making"). More broadly, the Board Member Defendants have failed to establish the lack of a genuine issue of material fact as to whether the decision to deny Mahon, III his position in any way implicated the District's budgetary priorities, the services provided by the District, or as to whether the decision would have any prospective impact whatsoever. Thus, the defendants' motion for summary judgment based on legislative immunity will be denied.

**4. Qualified Immunity**

The Board Member Defendants argue that they are qualifiedly immune from suit. Qualified immunity protects public officials "'from undue interference with their duties and from potentially disabling threats of liability.'" Wright v. City of Philadelphia, 409 F.3d 595, 599 (3d Cir. 2005) (quoting Elder v. Holloway, 510 U.S. 510, 514 (1994)). The doctrine does not apply when state officials "violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Id. at 599-600 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982)).

Therefore, the court must examine: (1) whether the officials violated a constitutional right, and (2) whether that right was clearly established at the time. Id.; Saucier v. Katz, 533 U.S. 194, 201-02 (2001).

The Board Member Defendants argue that the record does not establish that they knew of Mahon, IV's speech, therefore they could not have known that they were potentially violating his constitutional rights. As we have found, above, a reasonable jury could conclude that the Defendant Board Members knew of Mahon, IV's public speech and voted against Mahon, III in retaliation for that speech. The right to be free from retaliation for exercising one's First Amendment rights is itself a clearly established right. Anderson, 125 F.3d at 160. Accordingly, the Board Member Defendants' motion for summary judgment based on qualified immunity will be denied.

**5. Damages**

The defendants advance several arguments regarding the types of damages available to Mahon, IV. First, they cite Slicker v. Jackson, 215 F.3d 1225, 1230 (11th Cir. 2000) for the proposition that "compensatory damages in a § 1983 suit [must] be based on actual injury caused by the defendant rather than on the 'abstract value' of the constitutional rights that may have been violated." They argue that only the father, Mahon, III, had an actual injury, therefore Mahon, IV is ineligible for compensatory damages. The defendants also argue that Mahon, IV requested no other type of monetary relief and that, absent such a request, nominal damages are not to be considered. Mahon, IV admits he has had no economic loss relating to these events, but experienced stress and humiliation. (Doc. 33-4 at 7).

The defendants' arguments with respect to compensatory and nominal damages are unavailing. There is a genuine issue of material fact

as to whether Mahon, IV suffered an actual injury caused by the deprivation of his constitutional rights.  "Moreover, even if [plaintiff] is unable to establish a right to compensatory damages, he may be entitled to nominal damages." Atkinson v. Taylor, 316 F.3d 257, 265 n.6 (3d Cir. 2003) (citing Pryer v. C.O. 3 Slavic, 251 F.3d 448, 453 (3d Cir. 2001)("Where a constitutional deprivation has not caused actual injury, an award of nominal damages may be appropriate.").  Accordingly, the defendants' motion for summary judgment regarding compensatory and nominal damages will be denied.

Next, the defendants argue that punitive damages are not available against the School District as a municipality.  We agree that punitive damages are not appropriate against a municipality. City of Newport v. Facts Concerts, Inc., 453 U.S. 247 (1981).  Accordingly, to the extent Mahon, IV ever sought such damages, summary judgment is granted to the School District.  The issue of punitive damages with respect to other defendants will be reserved for trial.

**CONCLUSION**

For the reasons stated above, the defendants' motion for summary judgment will be denied, except with respect to punitive damages against Defendant Lake Lehman School District.  The plaintiff's section 1983 claim for First Amendment retaliation will proceed to trial.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES MAHON, IV** | : | No. 3:09cv2148 |
| Plaintiff | : | |
| v. | : | (Judge Munley) |
| **LAKE LEHMAN SCHOOL DISTRICT; CHARLES BALAVAGE; MARK KORNOSKI; HAROLD GREY; JOHN OLIVER, III; and MODERNO ROSSI,** | : | |
| Defendants | : | |

## ORDER

**AND NOW**, to wit, this **29th** day of August 2011, upon consideration of the defendants' motion for summary judgment, it is HEREBY **ORDERED** that the motion is **GRANTED** with respect to punitive damages against Defendant Lake Lehman School District and **DENIED** in all other respects.

**BY THE COURT:**

 s/ James M. Munley

**JUDGE JAMES M. MUNLEY
United States District Court**